# IN THE UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF MONTANA
# MISSOULA DIVISION

_____

DONNA GLANTZ,

                                                    CV 09-149-M-DWM-JCL

                    Plaintiff,

          vs.

                                                    FINDINGS AND
JERRY REN, and ANDY                                 RECOMMENDATION
BRINTON,                                            OF UNITED STATES
                                                    MAGISTRATE JUDGE

                    Defendants.

_____

Plaintiff Donna Glantz ("Glantz") brings this action pursuant to 42 U.S.C. §

1983, alleging that the defendant law enforcement officers, Jerril[1] Ren and Andy

Brinton, unlawfully arrested her and used excessive force in violation of her

federal constitutional rights.  The Defendants have moved for summary judgment

on the basis of qualified immunity.  Because neither of the Defendants violated

Glantz's constitutional rights, their motion should be granted and this case should

be dismissed.

_____

[1] Although the caption identifies Officer Ren's first name as Jerry, his actual
name is Jerril, as reflected in his affidavit.  Dkt. 15-1.

## I.    Background[2]

The events that ultimately led to this litigation date back to March 2004,

when Glantz's husband, Jim William Glantz ("Jim Glantz"), submitted the first of

three applications for liquor and gambling licensure with the State of Montana

Department of Justice.  Dkt. 15-3, at 10.  Randall Curtis ("Curtis"), a Criminal

Investigator for the Montana Department of Justice Gambling Control Division

Investigation Bureau, was assigned to investigate Jim Glantz's applications.  Dkt.

15-3, at 2.  During the course of that investigation, Curtis discovered that Jim

Glantz had failed to disclose a prior felony forgery conviction in Oregon and three

outstanding bench warrants for his arrest from Oregon.  Dkt. 15-3, ¶3.  Curtis also

learned that Jim Glantz had a felony deceptive practices conviction in Montana

and a federal conviction for felony tax fraud.  Dkt. 15-3, ¶3.

Defendant Andrew Brinton ("Brinton"), who also works as a Criminal

Investigator for the Montana Department of Justice Gambling Control Division

Investigation Bureau, assisted Curtis with his investigation and in doing so learned

about Glantz's criminal history.  Dkt. 15-2, ¶3.  As a result of that investigation,

the State of Montana filed a criminal information charging Jim Glantz with two

---

[2]  Consistent with well-established summary judgment standards, the following facts are taken from the materials of record and, where disputed, viewed in the light most favorable to the Plaintiff as the non-moving party.

PAGE 2

felony counts of tampering with public records and obtained a warrant for his arrest dated October 4, 2006.  Dkt. 15-3, at 14-16.  Dkt. 15-3, at 14-16.

Curtis received a copy of the warrant, and sometime before 9:00 o'clock a.m. the next morning drove to the vicinity of Jim Glantz's residence, at which time he observed Jim Glantz pull out of the driveway in a pickup truck.  Dkt. 15-3, ¶ 7.  Jim Glantz was accompanied at the time by his wife, Plaintiff Donna Glantz, who rode in the truck's passenger seat.  Dkt. 24-1, ¶ 2.  Because Curtis was in an unmarked State of Montana vehicle and did not have emergency lights, he decided it would not be appropriate for him to stop the Glantz vehicle.  Dkt. 15-3, ¶ 7. Using his cell phone, Curtis called Brinton, who was also aware of the outstanding warrant, and explained that he was following Jim Glantz's truck.  Dkt. 15-3, ¶ 7. Because Brinton was driving a similarly unmarked State vehicle, they decided to notify uniformed law enforcement to assist in making the traffic stop and executing the arrest warrant.

While Curtis stopped at the Montana Highway Patrol Office to ask for assistance, Brinton began following the Glantz vehicle.  Dkt. 15-3, ¶ 7.  Based on the information Curtis provided, a Montana Highway Patrol staff person made radio contact with one or more patrol units and advised them that a Gambling Control Officer needed assistance making a traffic stop on a vehicle occupied by a

PAGE 3

person for whom a felony arrest warrant had been issued.  Dkt. 15-3, ¶¶ 9-10, Dkt. 15-1, ¶ 3.  The staff person described the Brinton and Glantz vehicles, and reported that they were heading south on US Highway 93.  Dkt. 15-3, ¶ 9; Dkt. 15-1, ¶ 3.

Montana Highway Patrol Trooper Jerril Ren was heading north on US Highway 93 in his patrol car when he received the radio request for assistance.  Dkt. 15-1, ¶ 3.  Upon receiving the dispatch, Ren apparently recollected seeing the two vehicles and so turned and began driving south on US Highway 93 in an effort to catch up with them.  Dkt. 15-1, ¶ 3.  As Ren approached the vehicles with his emergency lights flashing, he passed Brinton's unmarked car and saw that there were two people in Jim Glantz's truck.  Dkt. 15-1, ¶ 4.  The truck pulled onto the shoulder of the highway and Ren initiated a felony traffic stop.  Dkt. 15-1, ¶¶ 4-5.  Ren exited his patrol car, drew his duty weapon, and directed the truck's two occupants to put their hands up where he could see them.  Dkt. 15-1, ¶ 5.  Ren ordered the driver, who he later learned was Jim Glantz, to turn off the vehicle, throw the ignition keys out of the driver-side window, and exit the vehicle with his hands visible.  Dkt. 15-1, ¶ 5. Jim Glantz fully complied with Ren's directions.  Dkt. 24-2, ¶ 17.

PAGE 4

Brinton arrived on the scene just as Jim Glantz was stepping out of his truck. Dkt. 15-2, ¶ 7. Brinton opened the driver-side door of his unmarked car, stood behind it, and drew his duty weapon. 15-2, ¶ 8. Ren instructed the driver to walk backwards toward the sound of his voice, kneel down, and interlace his fingers behind his head. Dkt. 15-1, ¶ 5. Ren holstered his gun and secured Jim Glantz with handcuffs. Dkt. 15-, ¶ 5. After conducting a protective pat down search, Ren placed Jim Glantz in the backseat of his patrol car. Dkt. 15-1, ¶ 5.

Ren then drew his duty weapon once again and directed the female passenger, who he later learned was Donna Glantz, to get out of the vehicle, keep her hands where he could see them, and back away from the vehicle. Dkt. 15-1, ¶ 6; Dkt. 24-1, ¶ 7. Ren ordered Glantz to kneel down and interlace her fingers behind her head, at which time he holstered his gun and secured her with handcuffs. Dkt. 15-,1 ¶ 6. Ren asked Glantz whether there were any firearms in the truck, but did not search the truck or conduct a pat down search.[3] Dkt. 24-1, ¶ 9; Dkt. 24-2, ¶ 9. Brinton, who had up until this time been stationed behind the

---

[3] Ren testified at his deposition that he could not specifically recall conducting a pat down search of Donna Glantz, but "believe[d]" he had done so. Dkt. 24-4, at 8. For summary judgment purposes, the Court will accept the Plaintiff's version of events and assume that Ren did not conduct even a cursory pat down search.

driver-side door of his vehicle with his weapon drawn, holstered his weapon and walked past Ren's patrol car to where Ren and Glantz stood. Dkt. 15-1, ¶ 9.

As Brinton walked by, Jim Glantz asked repeatedly from his vantage point in the patrol car why his wife was being arrested. Dkt. 24-2, ¶ 11. Donna Glantz also asked the officers why she was being arrested. Dkt. 15-3, ¶ 9; Dkt. 15-1, ¶ 6. When Brinton approached, he advised Glantz that she was not under arrest and Ren removed her handcuffs. Dkt. 15-2, ¶ 9; Dkt. 15-1, ¶ 6. According to both Brinton and Ren, Glantz was handcuffed for less than one minute. Dkt. 15-1, ¶ 6; Dkt. 24-5, at 8. Glantz does not directly dispute their assessment of the time she spent in handcuffs, representing only that she "was ultimately released from the handcuffs and allowed to return [to her] vehicle alone and unescorted to retrieve identification from [her] handbag." Dkt. 24-1, ¶ 14.

In response to Ren's request for identification, Glantz apparently produced a passport from her handbag in the truck. Dkt. 15-1, ¶ 7. When Ren returned to his patrol car to run a driver's license and warrant check on Jim and Donna Glantz, he noticed that he had accidentally turned the dashboard video camera off as he was first exiting his vehicle upon initiating the stop. Dkt. 15-1, ¶ 9. The camera remained off throughout the encounter, which Ren estimates lasted approximately eight minutes. Dkt. 15-1, ¶ 9.

PAGE 6

Dispatch informed Ren after running the check that Jim Glantz was the individual named on the arrest warrant, and that Donna Glantz was clear of any warrants but had an incomplete driver's license.  Dkt. 15-1, ¶ 8.  Because she did not have a valid driver's license, Glantz called her son for a ride.  Dkt. 15-1, ¶¶ 7, 10.

Shortly thereafter, Montana Highway Patrol Trooper Dustin Lerette arrived on the scene, and Ren asked him to stay with Glantz while she waited for her son to arrive.  Dkt. 15-4, ¶¶ 4-5.  Ren left the scene with Jim Glantz in his patrol car, and Brinton followed.  Dkt. 15-2, ¶ 13.  Lerette waited with Glantz for approximately twenty minutes, at which time Glantz's son arrived and she left the scene.  Lerette also departed the scene, thereby bringing the events of the day to a close.  Dkt. 15-4, ¶ 6.

On October 2, 2009, Glantz commenced this action under 42 U.S.C. § 1983, naming the State of Montana, Department of Justice Gambling Control Division, Department of Justice, Montana Highway Patrol, Randall Curtis, Jerry Ren, and Andy Brinton as Defendants.  Dkt. 1.  Glantz has amended her complaint twice since then and voluntarily dismissed all of the Defendants except for Ren and Brinton.  Dkt. 4, 11, 12.  Glantz advances her claims under 42 U.S.C. § 1983, alleging that on the day her husband was arrested,  Ren and Brinton unlawfully

PAGE 7

arrested her and used excessive force against her in violation of her federal constitutional rights.  Dkt. 12, ¶ 23.  Ren and Brinton have both moved for summary judgment based on qualified immunity.

## II.    Summary Judgment Standards

Under Federal Rule of Civil Procedure 56(c), a party is entitled to summary judgment "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  The party seeking summary judgment bears the initial burden of informing the Court of the basis for its motion, and identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of any genuine issue of material fact.  *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). A movant may satisfy this burden where the documentary evidence produced by the parties permits only one conclusion.  *Anderson v. Liberty Lobby Inc.*, 477 U.S. 242, 251 (1986).  And where the nonmoving party bears the burden of proof at trial, the moving party may satisfy its initial burden on summary judgment by showing that there is an absence of evidence in the record to support the nonmoving party's claims. *Celotox*, 47 U.S. at 325.

PAGE 8

Once the moving party has satisfied its initial burden with a properly supported motion, summary judgment is appropriate unless the non-moving party designates by affidavits, depositions, answers to interrogatories of admissions on file, "specific facts showing that there is a genuine issue for trial." *Celotex Corp. v. Cattrett*, 477 U.S. 317, 324 (1986). The party opposing a motion for summary judgment "may not rest upon the mere allegations or denials of his pleadings...." *Anderson*, at 248.

In deciding a motion for summary judgment, the Court views the evidence in the light most favorable to the non-moving party and draws all justifiable inferences in the non-moving party's favor. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986); *Betz v. Trainer Wortham & Co., Inc.*, 504 F.3d 1017, 1020-21 (9th Cir. 2007).

## III.   Discussion

To prevail on a claim under 42 U.S.C. § 1983, "a plaintiff must show (1) that the conduct complained of was committed by a person acting under color of state law; and (2) that the conduct deprived the plaintiff of a constitutional right." *Balistreri v. Pacifica Police Dep't.,* 901 F.2d 696, 699 (9th Cir. 1990). As state actors, law enforcement officers like Ren and Brinton are entitled to qualified immunity from liability in a Section 1983 action if their conduct "either does not

violate a federal constitutional right, or the constitutional right was not clearly established on the date of the alleged violation." *Broam v. Bogan*, 320 F.3d 1023, 1028 (9th Cir. 2003) (citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  Qualified immunity provides an immunity from suit rather than a mere defense to liability." *Mattos v. Agarano*, 590 F.3d 1082, 1086 (9th Cir. 2010).

Courts addressing a law enforcement officer's claim of qualified immunity are to follow the two-part analysis established by the United States Supreme Court in *Saucier.*  The "threshold question" under the *Saucier* analysis is whether "[t]aken in the light most favorable to the party asserting the injury," the facts as "alleged show the officer's conduct violated a constitutional right[.]" *Saucier*, 533 U.S. at 201.  If there was no constitutional violation, no further inquiry is necessary.  *Saucier,* 533 U.S. at 201.

If the facts as alleged do show that the officer's conduct violated a constitutional right, however, the court must next consider "whether the right was clearly established in light of the specific context of the case." *al-Kidd v. Ashcroft*, 580 F.3d 949, 964 (9th Cir. 2009).  "For a constitutional right to be clearly established, its contours must be sufficiently clear that a reasonable official would understand that what he is doing violates that right." *al-Kidd*, 580 F.3d at 964 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).

PAGE 10

While *Saucier* instructed that these two inquiries be made in the sequential order set forth above, the United States Supreme Court has since made clear that courts may "exercise their sound discretion in deciding which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 129 S.Ct. 808, 818 (2009). Because it is appropriate to do so here, the Court will apply the two-step process outlined in *Saucier* in its traditional sequence.

Accordingly, the Court turns first to the question of whether the facts as alleged by Glantz show that either Ren or Brinton violated her federal constitutional rights. To answer this question, it is necessary to first identify the federal constitutional right or rights at issue. *Graham v. Connor*, 490 U.S. 386, 394 (1989). Glantz alleges that Ren and Brinton wrongfully arrested her and used excessive force in violation of the rights secured her by the Fourth Amendment to the United States Constitution, and applicable to the States through the Fourteenth Amendment. Dkt. 23, ¶ 4C.

 The Court specifically held in *Graham* "that *all* claims that law enforcement officers have used excessive force – deadly or not – in the course of an arrest, investigatory stop, or other 'seizure' of a free citizen should be analyzed under the Fourth Amendment and its 'reasonableness' standard...." *Graham*, 490

PAGE 11

U.S. at  395.  Glantz's claims are premised entirely on her allegations that Ren and Brinton wrongfully detained and arrested her on the day in question, and used excessive force against her during the course of their encounter.  As *Graham* instructs, such claims are most properly characterized as invoking the protections of the Fourth Amendment, which guarantees citizens the right to be free from unreasonable searches and seizures.[4]  *Graham*, 490 U.S. at 396.

Glantz does not dispute, nor could she, that Ren had probable cause to initiate the traffic stop and arrest her husband pursuant to the outstanding warrant for his arrest.  Rather, she claims Ren and Brinton used an excessive level of force against her during the encounter, and correspondingly asserts that in doing so they effectively converted an otherwise lawful investigatory stop into an unlawful arrest.

Fourth Amendment excessive force claims such as these must be evaluated "under an objective reasonableness standard."  *Espinosa v. City and County of San Francisco*, 598 F.3d 528, 537 (9th Cir. 2010).  "The 'reasonableness' of a particular use of force must be judged from the perspective of a reasonable officer

---

[4]  Glantz's Second Amended Complaint also cursorily alleges the Defendants' conduct violated her First and Fifth Amendment rights.  Because her claims are governed exclusively by the Fourth Amendment, Glantz cannot state a claim under the First and Fifth Amendments.

PAGE 12

on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396. The proper inquiry is "whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Graham*, 490 U.S. at 397.

To determine whether a Fourth Amendment violation has taken place under this objective standard, the Court "must balance the extent of the intrusion on the individual's Fourth Amendment rights against the government's interests to determine whether the officer's conduct was objectively reasonable based on the totality of the circumstances." *Espinosa*, 598 F.3d at 537. "Stated another way, [the Court] must 'balance the amount of force applied against the need for that force.'" *Bryan v. MacPherson*, 608 F.3d 614, 620 (9th Cir. 2010) (*quoting Meredith v. Erath*, 342 F.3d 1057, 1061 (9th Cir. 2003)).

This balancing analysis typically involves three steps. *Espinosa*, 598 F.3d at 537; *Mattos*, 590 F.3d at 1086. First, the court must "assess the gravity of the particular intrusion on Fourth Amendment interests by evaluating the type and amount of force inflicted." *Mattos*, 590 F.3d at 1086. Second, the court considers "the government's interests by assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape." *Espinosa*, 598

PAGE 13

F.3d at 537.  Finally, the court weighs "the gravity of the intrusion against the

government's interest to determine whether the force used was constitutionally

reasonable."  *Mattos*, 590 F.3d at 1086.

## A.  Nature and Quality of the Intrusion

As these cases instruct, this Court begins by assessing the "gravity of the

intrusion" on Glantz's Fourth Amendment rights occasioned by the Defendants'

conduct.  The United States Supreme Court has made clear "that an officer making

a traffic stop may order passengers to get out of the car pending completion of the

stop."  *Maryland v. Wilson*, 519 U.S. 408, 415 (1997).   Noting that for all

practical purposes "the passengers are already stopped by virtue of the stop of the

vehicle," the Court characterized any "additional intrusion" occasioned by

ordering them out of the car as a "minimal" one. [5]  *Wilson*, 519 U.S. at 413-14.

Because there is no dispute that Ren lawfully stopped the vehicle in which

Glantz was a passenger, he and Brinton were entitled as a matter of course to order

that she exit the vehicle pending completion of the stop.  *Wilson*, 519 U.S. at 414-

15.  It is undisputed, however, that Ren and Brinton did more than just order

Glantz out of the vehicle.  Based on the information he received from dispatch,

---

[5] Likewise, an officer in a traffic encounter may order a passenger back into a
car that he has voluntarily exited without running afoul of the Fourth Amendment.
*United States v. Williams* 419 F.3d 1029, 1034 (9th Cir. 2005).

which was that one of the vehicle's two occupants was wanted on a felony arrest

warrant, Ren initiated felony stop procedures for officer safety reasons.  Dkt. 15-1

¶ 5.  Ren first secured the driver and then turned his attention to the vehicle's

passenger.  With his gun drawn and Brinton providing backup, Ren instructed

Glantz to get out of the vehicle with her hands visible.  Dkt. 15-1 ¶ 6.  He directed

her to walk away from the vehicle on what she characterizes as steep terrain and

kneel down on the rocky ground.  Dkt. 24-1 ¶¶ 7, 9.  Ren then holstered his gun,

handcuffed Glantz, and assisted her to her feet.  Dkt. 15-1 ¶ 6.   Even taking

Glantz's version of the facts as true, she could not have been handcuffed for more

than a minute or two before Brinton advised her she was not being arrested and

Ren removed her handcuffs so that she could retrieve her identification from the

truck.[6]

   To the extent Glantz claims the fact that she was ordered out of her car at

gunpoint and handcuffed automatically converted her detention into an unlawful

arrest, she is mistaken.  The Ninth Circuit addressed a similar claim in  *Allen v.*

*City of Los Angeles*, 66 F.3d 1052, 1056 (9th Cir. 1995) where the passenger in a

lawfully stopped vehicle alleged "that the methods the defendants used to detain

---

[6] Glantz offers nothing to contradict Ren's estimate that by the time he returned
to his patrol car with Glantz's identification, roughly eight minutes had passed since
he had initiated the stop. Dkt. 15-1, ¶ 9.

him converted the initially lawful *Terry* stop into a full-fledged arrest for which

probable cause was required, but was lacking."  After a high speed chase, the

officer in *Allen* ordered the plaintiff passenger out of the car, pointed a gun at him,

forced him to lie on the ground, handcuffed him, and detained him in a police

vehicle for several minutes before releasing him.  *Allen*, 66 F.3d at 1055.  The

court rejected  the plaintiff's unlawful arrest claim, explaining as it did so that

"[p]ointing a weapon at a suspect, ordering him to lie on the ground, handcuffing

him, and placing him for a brief period in a police vehicle for questioning –

whether singly or in combination – does not automatically convert an

investigatory detention into an arrest requiring probable cause."  *Allen*, 66 F.3d at

1056. The court recognized that "whether an arrest has occurred depends on all the

surrounding circumstances," and concluded that the officer's actions in that case

"were reasonable under the circumstances, and did not amount to an arrest."

*Allen,* 66 F.3d at 1057.  *See also Gallegos v. City of Los Angeles*, 308 F.3d 987,

991-92 (9th Cir. 2002) (explaining that "an investigative detention does not

automatically become an arrest when officers draw their guns, use handcuffs, or

place a suspect in the back of a patrol car") (citations omitted).

    While the use of a weapon and handcuffs does not automatically convert a

detention into a full fledged arrest, it undoubtedly increases the intrusiveness of

PAGE 16

that detention.  The Ninth Circuit has repeatedly held "that the use of guns and handcuffs during an investigatory detention must be justified by the circumstances."  *Meredith*, 342 F.3d at 1062 (citations omitted).  "Because handcuffing 'substantially aggravates the intrusiveness' of a detention, it follows that circumstances which would justify a detention will not necessarily justify a detention by handcuffing."  *Meredith*, 342 F.3d at 1063.  Something "[m]ore is required."  *Meredith*, 342 F.3d at 1063.

For purposes of determining whether that "something more" was present in this case, thereby justifying the officers' use of guns and handcuffs, the Court must consider the government's countervailing interest in the use of force under the circumstances.

**B.  Governmental Interest**

The Court evaluates the government's interest in the use of force in any given case by "assessing (1) the severity of the crime; (2) whether the suspect posed an immediate threat to the officers' or public's safety; and (3) whether the suspect was resisting arrest or attempting to escape."  *Espinosa*, 598 F.3d at 537.

The first and last of these factors say nothing about whether the government had an interest in using force in this case.  It is  undisputed that Glantz was stopped and detained only by virtue of the fact that she was a passenger in her

PAGE 17

husband's vehicle, and had not committed any crime.  It is also undisputed that Glantz cooperated fully with officers Ren and Brinton, and did not resist their commands or attempt to escape.  Whether the government had an interest in the use of force in this case thus turns on application of the second factor, pursuant to which the Court must consider whether Glantz posed an immediate threat to the safety of the officers or others.

Where, as here, the government stakes its interest in the use of force on officer safety concerns, "there must be objective factors to justify such a concern." *Bryan*, 608 F.3d at 622.  "A simple statement by an officer that he fears for his safety or the safety of others is not enough."  *Bryan*, 608 F.3d at 622.   Even viewing the facts in the light most favorable to Glantz, Ren and Brinton had an objectively reasonable basis to fear for their own safety.

As the United States Supreme Court recognized in *Wilson*, even routine "traffic stops may be dangerous encounters" and give rise to officer safety concerns.  *Wilson*, 519 U.S. at 413.  In any traffic stop, there is an "inordinate risk confronting [the] officer as he approaches a person seated in an automobile." *Pennsylvania v. Mimms*, 434 U.S. 106, at 110 (1977).  Concerns for officer safety are "likely to be greater when there are passengers in addition to the driver in the stopped car."  *Wilson*, 519 U.S. at 414.  *See also United States v. Holt*, 264 F.3d

PAGE 18

1215, 1223 (10th Cir. 2001) (explaining that "[a]n officer in today's reality has an objective, reasonable basis to fear for his or her life every time a motorist is stopped").

While even routine traffic stops thus give rise to some concern for officer safety, those concerns may be heightened if the traffic stop is initiated for the purpose of executing a felony arrest warrant on one of the vehicle's occupants. *See e.g. Holt*, 264 F.3d at 1223.  Consistent with this notion, the Ninth Circuit has adopted the so called "automatic companion rule," holding that "[a]ll companions of [an] arrestee within the immediate vicinity, capable of accomplishing a harmful assault on the officer, are constitutionally subjected to the cursory 'pat down' reasonably necessary to give assurance that they are unarmed." [7]  *United States v. Berryhill*, 445 F.2d 1189, 1193 (9th Cir. 1971).

Because Ren and Brinton stopped the Glantz vehicle for the purpose of executing a felony arrest warrant on one of the occupants, they had an objectively reasonable basis to fear for their own safety during the encounter.   Ren did not know which of vehicle's two occupants was named on the outstanding arrest warrant as he effected the traffic stop.  It was objectively reasonable for him to

---

[7] While the bright-line rule adopted in *Berryhill* has been adopted by some circuits, others have rejected the rule in favor of a "totality of the circumstances" test. *See e.g. United States v. Bell*, 762 F.2d 495, 498 (6th Cir. 1985).

draw his weapon, order both of the occupants out of the vehicle, and secure them with handcuffs pursuant to standard felony stop procedures.[8]  Likewise, it was objectively reasonable for Brinton to remain stationed behind the door of his vehicle with his weapon drawn, while Ren implemented those felony stop procedures.  Glantz had not been handcuffed for more than a minute or two by the time Brinton stepped forward and stated that she was not under arrest.   As soon as Brinton indicated that Glantz was not the individual wanted on the warrant, Ren released her from the handcuffs and permitted her to retrieve her identification. Any objectively reasonable officer tasked with stopping the Glantz vehicle and arresting one of its occupants on a felony warrant would have had legitimate concerns for his own safety, thereby justifying use of the felony stop procedures employed by Ren and Brinton.

Glantz nevertheless questions the legitimacy of the safety concerns underpinning the officers' qualified immunity defense.  According to Glantz, it is apparent that Ren and Brinton did not actually fear for their safety during the encounter because they did not subject Glantz to a pat down search, and did not search the vehicle for weapons before releasing her from handcuffs.   As discussed

---

[8]  Ren testified at his deposition that he effected the traffic stop in accordance with felony stop procedures.   Dkt. 24-4, at 7.

above, however, both Ren and Brinton had an objectively reasonable concern for their own personal safety as they effected the traffic stop and executed the warrant. That concern understandably diminished as the encounter transpired, as evidenced by the fact that Glantz complied fully with all of Ren's directions.  With Jim Glantz restrained in the patrol car, officers Ren and Brinton advised the fully cooperative Glantz that she was not under arrest and allowed her to retrieve her identification from the vehicle.  That the officers ultimately saw no need to conduct a pat down or search the vehicle once Jim Glantz was secured and Donna Glantz exhibited complete cooperation, does not somehow negate the fact that they had an objectively reasonably basis to be concerned for their own safety as they carried out the stop and secured the scene.

Glantz also suggests that Brinton's actions that day were motivated not by any objectively reasonable safety concerns, but by personal animus.  Glantz maintains that both she and her husband were well known to Brinton, who had encountered them several times in public and once intruded into the office of her liquor store without her consent. Dkt. 24-1 ¶ 12.

The United States Supreme Court has made clear, however, that "[t]he Fourth Amendment inquiry is one of 'objective reasonableness' under the circumstances, and subjective concepts like 'malice' and 'sadism' have no proper

PAGE 21

place in that inquiry." *Graham*, 490 U.S. at 399.  This means that "[a]n officer's evil intentions will not make a Fourth Amendment violation out of an objectively reasonable use of force; nor will an officer's good intentions make an objectively unreasonable use of force constitutional." *Graham*, 490 U.S. at 398.  Because an officer's intentions are not relevant, "a defense of qualified immunity may not be rebutted by evidence that the defendant's conduct was malicious or otherwise improperly motivated." *Crawford-El v. Britton*, 523 U.S. 574, 588 (1998).

As discussed above, both Ren and Brinton had an objectively reasonable basis to be concerned for their own safety as they effected the traffic stop and executed the arrest warrant.  In view of these legitimate officer safety concerns, there was a strong governmental interest justifying the use of felony stop procedures, pursuant to which Glantz was ordered out of the vehicle at gunpoint and placed briefly in handcuffs.

## C.    Balancing the Competing Interests

The final step for purposes of determining whether Ren and Brinton violated Glantz's Fourth Amendment rights is for the Court to balance the gravity of the intrusion against the government's countervailing interests.  *Graham*, 490 U.S. at 396.  In other words, the Court must "balance the amount of force applied against the need for that force." *Bryan,* 608 F.3d at 620.

PAGE 22

In this case, the *Graham* balancing test comes out in favor of the government.  Even assuming events at the scene transpired exactly as Glantz maintains, the level of force Ren and Brinton  employed was not excessive under the circumstances and did not transform Glantz's temporary detention into an unlawful arrest.  While the use of felony stop procedures perhaps meant that Glantz was subjected to a greater degree of force than she likely would have been had the vehicle in which she was riding been stopped for a traffic violation and her husband not been wanted on a felony arrest warrant, the government's strong interest in executing that warrant while preserving officer safety outweighed any intrusion on Glantz's Fourth Amendment interests.

To conclude otherwise in this case would be to improperly judge the actions Ren and Brinton took that day, not from the perspective of a reasonable officer on the scene,  but with the "20/20 vision of hindsight."  *Graham*, 490 U.S. at 396. The Court must allow "for the fact that police officers are often forced to make split-second judgments – in circumstances that are tense, uncertain, and rapidly evolving – about the amount of force that is necessary in a particular situation. *Graham*, 490 U.S. at 396-97.  It is not for this Court to second guess those split second judgments.

PAGE 23

Because the gravity of any Fourth Amendment intrusion was outweighed by the government's countervailing interests, there was no constitutional violation. Absent a constitutional violation, Officers Ren and Brinton are entitled to qualified immunity and Glantz's § 1983 claims for unlawful arrest and excessive force fail as a matter of law.

As a final matter, it is worth noting that Glantz also alleges that Brinton "failed to stop or deter" Ren from violating her constitutional rights.  Dkt. 12, ¶ 25. It is true that police officers may be liable under 42 U.S.C. § 1983 for failing to intercede "when their fellow officer violate the constitutional rights of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).   As discussed above, however, even assuming events that day unfolded entirely as Glantz claims, Ren did not violate her Fourth Amendment rights.  It follows then, that Brinton cannot be held liable under 42 U.S.C. § 1983 for failing to intercede with Ren's use of felony stop procedures.

With the dismissal of her § 1983 claims, Glantz will be left only with her state law claims under Article II, Section 11 of the Montana Constitution for unlawful arrest and excessive force in effecting the arrest.  Dkt. 23, ¶ 4C(2). Under 28 U.S.C. § 1367(c)(3), the Court may decline to exercise supplemental jurisdiction over state law claims if the court "has dismissed all claims over which

PAGE 24

it has original jurisdiction."  Because Glantz's § 1983 claims should be dismissed, and her state law claims are more properly addressed in state court, the Court should decline to exercise supplemental jurisdiction and dismiss this action in its entirety.

## IV.    Conclusion

Because the facts, even when viewed in the light most favorable to Glantz, show that Ren and Brinton did not violate Glantz's constitutional rights, the Court need not address the second prong of the qualified immunity analysis and determine whether the asserted right was clearly established.  *Saucier*, 533 U.S. at 201.  Officers Ren and Brinton are entitled to qualified immunity, and Glantz's claims under 42 U.S.C. § 1983 should be summarily dismissed.  Furthermore, the Court should decline to exercise supplemental jurisdiction over Glantz's remaining state law claims.  Accordingly,

IT IS RECOMMENDED that the Defendants' Motion for Summary Judgment be GRANTED and this case be dismissed.

DATED this 17th day of September, 2010

/s/ Jeremiah C. Lynch
Jeremiah C. Lynch
United States Magistrate Judge

PAGE 25